[Cite as *State v. Kidd*, 2021-Ohio-3838.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-200356 |
| | | TRIAL NO. B-1900139 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| JOSEPH KIDD, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal:  October 29, 2021


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummins*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michael J. Trapp*, for Defendant-Appellant.

**ZAYAS, Presiding Judge.**

{¶1}    Joseph Kidd appeals his convictions following a jury trial for six counts of rape of a child under ten years old.  For the following reasons, we affirm the trial court's judgment in part, reverse the judgment in part, and remand the cause to the trial court.

Procedural and Factual Background

{¶2}    On February 14, 2019, Joseph Kidd was indicted on two counts of rape for engaging in fellatio with A.O., a child under ten years old, two counts of rape for inserting his penis in A.O.'s anus, a child under ten years old, and two counts of rape for engaging in fellatio with A.O., a child under ten years old.  All of the offenses occurred between November 21, 2015, and May 11, 2016.

{¶3}    At the time of the offenses, Kidd was living with his girlfriend K.O. in a trailer on Compton Road.  They lived with K.O.'s two sons, A.O. and M.O., and their daughter S.O.

{¶4}    In June 2016, A.O. and M.O. lived in a foster home.  A child in the foster home was being investigated for possible sexual abuse.  At that time, A.O. was interviewed at the Mayerson Center.  A.O. stated that a foster child named Poppy had sexually abused his brother M.O.  At the interview, A.O. denied that anyone had hurt him or had touched him on his body.

{¶5}    In July 2016, both boys were moved to another foster home with Rachel Dyson.  Dyson testified that she saw A.O. masturbating under a blanket three days after he arrived.  When she asked him what he was doing, he responded, "Joseph."  She questioned both boys, and based on their responses, she contacted

social worker LaShawn Nelson.

{¶6} Nelson, a caseworker for 21 years for the Hamilton County Department of Job and Family Services ("HCJFS"), became A.O.'s caseworker in July 2016. She was contacted by Dyson in 2016 regarding sexual statements and behavior by A.O. Typically, when reports of sexual allegations surfaced, Nelson would speak with the child about the allegations, refer the child to the Mayerson Center, and contact the police. However, she did not do so at the time.

{¶7} In March 2017, A.O. was moved to a foster home with Luz Santiago. Nelson met with Santiago and A.O. regarding an allegation of sexual abuse and referred A.O. to the Mayerson Center based upon that conversation. Nelson also spoke with M.O. regarding the allegation.

{¶8} Cecilia Friehofer, a social worker and forensic interviewer at the Mayerson Center, was qualified as an expert in forensic interviewing, suspected child abuse victims, and delayed disclosures. She interviewed A.O. in November 2018 due to a disclosure that Kidd had touched A.O.'s penis. The summary and recording of the interview were admitted into evidence.

{¶9} At the time of the interview, Friehofer was unaware that the abuse was alleged to have happened in 2016. A.O. spontaneously disclosed that his dad put his dad's mouth on his penis, his dad had him put his mouth on his dad's penis, and his dad put his penis in A.O.'s "butt." A.O. also described that his dad ejaculated in his mouth and "butt." A.O. stated that he was six years old when these bad things happened. The video was played, and the jurors received a transcript of the interview. After the interview, Friehofer referred A.O. for a medical examination

3

with a physician.

{¶10} Friehofer explained that delayed disclosures are either purposeful or accidental. Purposeful is when the child decides to tell, and accidental is when the abuse is discovered by accident. A.O. purposefully disclosed. According to Friehofer, 99.9 percent of the children she has interviewed have delayed disclosures. Friehofer discussed numerous reasons why children have delayed disclosures.

{¶11} On cross-examination, the defense played the Mayerson Center interview of A.O. conducted in June 2016. In that interview, A.O. had disclosed an incident with his dad that happened in the bathroom. He did not discuss that incident with Friehofer.

{¶12} Although A.O. stated in his 2016 interview that Joseph had not hurt or touched him, Friehofer discounted the statement because the question was a compound question and A.O. was unwilling to disclose at that time. Friehofer admitted that she had concerns regarding A.O.'s mental capacity, but she initially described him as age and developmentally appropriate because he had not been diagnosed with any delays.

{¶13} A.O. told Friehofer that one of the incidents happened while his mother was at work at a Chinese restaurant. A.O. also stated that one incident occurred in the car while they were driving to the restaurant to pick up his mom from work. When asked for Joseph's last name, A.O. responded "Barger." Friehofer believed that A.O. was unsure of Joseph's last name because his inflection went up when he stated "Barger" as if he were questioning if his dad's last name was Barger.

{¶14} At the end of the interview, A.O. said that he had seen Joseph do

4

similar things with his mom's mom and his mom's sister. When Friehofer asked for clarification, A.O. admitted that he did not see Joseph with his grandmother and his aunt.

{¶15} M.O., A.O.'s younger brother, was the next witness. Prior to testifying, M.O. was questioned to determine his competence as a witness because he was nine years old. Although he initially was unable to explain the difference between the truth and a lie, when given examples, he could differentiate the truth from a lie. When the court found him competent to testify, Kidd did not object.

{¶16} M.O. described Joseph as a "bad man" who was not nice to him or his brother. He testified that he had seen Kidd touch A.O.'s private parts when he was exiting from the bathroom. Joseph and A.O. were sitting on the couch, and Joseph made A.O. suck his penis. A.O. asked for help, so M.O. tried to get Joseph off of him, but he was too small. M.O. did not know where his mom or his sister were during that incident. When asked to identify Joseph in the courtroom, M.O. was unable to do so.

{¶17} On cross-examination, M.O. was asked if he remembered speaking with Detective McBride and telling him that he saw Joseph and A.O. in the bathroom. M.O. responded that he saw them outside of the bathroom. When the video of the interview was played, M.O. initially exclaimed that he never said that. When asked if he was telling the truth on the video or telling the truth now, he said, "that time."

{¶18} In the video, he told McBride that he asked his sister S.O. to help, but he testified that it was A.O. who asked S.O. for help. He had also told McBride that

5

his mother was sitting on the couch while on her phone. When confronted with these inconsistencies, M.O. blurted, "Everything's a lie." He reaffirmed that everything was a lie. On redirect examination, he again stated, "Everything's a lie." After several questions to clarify what he meant, M.O. was asked if he was lying when he said he saw Joseph's penis in A.O.'s mouth, he responded, "No." M.O. responded, "Yes" when asked if he saw it with his own eyes.

{¶19} A.O., who was ten years old, was the next witness. He did not know his right hand from his left hand, and did not know what year he was born. A.O. testified that Joseph was mean. When asked what he meant by Joseph was being mean, A.O. replied, "He was being mean to us."

{¶20} A.O. testified that Joseph touched his penis with his hand. When asked what Joseph did when he touched his penis, A.O. explained that "he played with it." A.O. also testified that "he put his mouth on [his penis]" in a room in the trailer. Although A.O. initially responded "nothing" when asked if Joseph said anything before putting his mouth on his penis, he later testified that Joseph said "don't bite it." When asked if that happened one time or more than one, he stated, "more than one." A.O. further stated, "he made me put my mouth on his penis and he peed." When that happened, A.O. washed his mouth. A.O. testified that it felt, "nasty." A.O. testified that on one occasion, he called his brother to help him, and M.O. pulled him out.

{¶21} A.O. said that when he and his siblings were in the truck, his dad called him up to the front while he was driving and put his penis in A.O.'s mouth. A.O. further explained that "slobber" came out and got on his mouth. His mother was at

6

home when this happened. A.O. also testified that, "My dad was touching his dick and his penis inside * * * my behind." When asked if that happened one time or more than one time, he responded "more than." A.O. identified Joseph in court.

{¶22} Detective Sean McBride, a criminal investigator with the Springfield Township Police Department, testified that he investigates all sex offenses involving juveniles. He had been an investigator for seven years. McBride was trained to conduct interviews at the Reid School of Interview and Interrogation. Typically, he does not interview children unless Mayerson Center declines to do the interview. In this case, he interviewed M.O. because Mayerson Center would not do the interview. He did not interview A.O.

{¶23} McBride interviewed A.O.'s mother and his grandmother. McBride also interviewed Kidd at the jail for approximately an hour. The audio recording of the interview was played for the jury. Kidd denied any sexual contact with A.O., but admitted that it was possible that A.O. saw him masturbate once.

{¶24} McBride was contacted by HCJFS caseworker Nelson. He reviewed A.O.'s Mayerson Center interview. During the interview, A.O. had stated that when the incident in the truck occurred, his mother had called and they were going to pick her up from work at a Chinese restaurant. McBride determined that his mother had been unemployed for years.

{¶25} After McBride's testimony, the state rested.

{¶26} The defense called S.O. to testify, and the court asked her questions to determine her competency. S.O., who was seven years old, lived with her paternal grandmother. S.O. was able to give examples of lies. The court determined that S.O.

7

was competent to testify, knew the difference between right and wrong, and a lie and the truth.

{¶27} S.O. testified that she never saw Joseph do any "adult things" with A.O. S.O. was three years old when they lived in the trailer. S.O. further stated that A.O. never asked for help, and she and M.O. never pulled him off of her father when her father was doing "adult things" to A.O. After S.O.'s testimony, the defense rested, and the state called a rebuttal witness, Dr. Kathi Makoroff.

{¶28} Dr. Makoroff is a child-abuse pediatrician at Children's Hospital. The parties stipulated that she was an expert in child abuse. Both brothers were physically examined, which revealed a normal physical exam with no evidence of trauma. The most common finding on a child who has been sexually abused is a normal exam, especially when the abuse occurred more than three days prior to the exam.

{¶29} The jury found Kidd guilty of all of the charges. The trial court sentenced Kidd to life without parole on every count to run consecutively based on its findings that Kidd showed no remorse, and the harm caused by two or more of the offenses was so great and unusual that no single prison term would reflect the seriousness, Kidd's criminal history and the need to protect the public. Kidd was also ordered to have no contact with the victims.

{¶30} Kidd now appeals, raising ten assignments of error.

### A.O.'s Competency to Testify

{¶31} In his first assignment of error, Kidd argues that the trial court erred by failing to determine whether A.O., a child of unsound mind, was competent to

testify.

{¶32} Evid.R. 601(A) and R.C. 2317.01 state that a person is competent to testify "except those of unsound mind and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." A person "of unsound mind" includes "all forms of derangement or intellectual disability." R.C. 1.02(C). "In order for the trial court to have a sua sponte duty to inquire into a witness's competency, that competency must have been clearly called into question by the time the witness was called to the stand." *State v. Cooper*, 139 Ohio App.3d 149, 164, 743 N.E.2d 427 (12th Dist.2000), citing *State v. Kinney*, 35 Ohio App.3d 84, 86, 519 N.E.2d 1386 (1st Dist.1987).

{¶33} Kidd asserts that the trial court committed plain error by allowing A.O. to testify without determining his competency where his intellectual limitations had been noted by the state in its opening remarks and by the testimony of his caseworker Nelson who believed his IQ was 58.

{¶34} Relying on *State v. Kinney*, Kidd argues that A.O.'s competency was clearly called into question due solely to his low IQ. In *Kinney*, this court concluded that the trial court's failure to sua sponte determine the ten-year-old witness's competence was plain error. *Kinney* at 86. Before the child testified, her mother explained that the child was "mentally retarded, that her mental age level was four or five years old, that her I.Q. was lower than 58, and that she would sometimes make things up as a way of reaching out for help." *Id.* A second witness, a police officer who interviewed the child, testified that he knew she was mentally retarded and had

"confused the incident in question with a separate incident involving appellant." *Id.* Both witnesses questioned the child's ability to accurately and truthfully perceive facts and communicate them. *See id.*

{¶35} Here, A.O.'s ability to observe, recollect, and communicate the facts was not questioned by any of the witnesses, and Kidd did not challenge A.O.'s competency to testify truthfully. Our thorough review of the testimony indicates that A.O. did not testify in such a way as to undermine his ability to accurately relay the facts. Therefore, the trial court had no compelling reason to sua sponte determine A.O.'s competence to testify. *See Cooper*, 139 Ohio App.3d at 165, 743 N.E.2d 1427.

{¶36} We overrule the first assignment of error.

### Ineffective Assistance of Trial Counsel

{¶37} In his second assignment of error, Kidd contends that he did not receive the effective assistance of counsel when counsel failed to object to A.O.'s testimony due to his incompetence to testify.

{¶38} To establish ineffective assistance of counsel, an accused must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the accused. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The failure to make either showing is fatal to the claim. *Id.* at 697. A defendant is prejudiced by counsel's performance if there is a reasonable probability that the outcome of the proceedings would have been different but for the complained-of conduct. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

{¶39} As previously discussed, our review of the record indicates that A.O.'s

testimony did not place his competence into question. Therefore, we cannot conclude that Kidd's trial counsel was deficient in failing to challenge A.O.'s competency. Accordingly, we overrule the second assignment of error.

### M.O.'s Competency to Testify

**{¶40}** Next Kidd argues that the trial court erred by finding M.O. competent to testify.

**{¶41}** Ordinarily, a trial court's finding that a child under the age of ten is competent to testify shall not be disturbed, absent an abuse of discretion. *State v. Frazier*, 61 Ohio St.3d 247, 250, 574 N.E.2d 483 (1991). Here, Kidd did not object to the trial court's determination that M.O. was competent to testify, so we review for plain error. *See Kinney*, 35 OhioApp.3d at 86, 519 N.E.2d 1386.

**{¶42}** In determining whether a child under ten years old is competent to testify, the trial court must take into consideration: "(1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful." *Frazier* at 251. A trial court's determination that a witness is competent to testify must be granted great deference because the trial judge has the opportunity to observe the person's appearance, his or her manner of responding to the questions, general demeanor and any indicia of ability to relate the facts accurately and truthfully. *See id.*

**{¶43}** At the competency hearing, M.O. was able to provide the court with his

name, age, birthday, the names of his siblings and mother, the city he lived in, and the name of the home where he lived. Although he could not articulate the difference between a lie and the truth, he correctly distinguished between truthful and false statements when questioned by the court. He also understood that lying was bad, and if a person tells the truth, that person will not get in trouble. Notably, Kidd did not wish to ask M.O. any additional questions and did not object to the court's finding that M.O. was competent.

{¶44} M.O. understood the difference between telling the truth and lying, and that it was important to tell the truth. Based on this record, M.O. was competent under the *Frazier* factors. The third assignment of error is overruled.

Kidd's Competence to Stand Trial

{¶45} In his fourth assignment of error, Kidd asserts that the trial court erred by trying him without determining whether he was competent to stand trial.

{¶46} On August 12, 2019, during a pretrial hearing, Kidd informed the trial court that he wished to fire his two appointed attorneys because he believed each attorney was telling him something different, and he had not seen any paperwork regarding his case. Kidd's counsel informed the court that he had filed a suggestion of incompetency at the request of Kidd and based on his own concerns as they were preparing for trial. Trial counsel was unsure if Kidd wanted to fire his attorneys because they requested a competency evaluation.

{¶47} Kidd explained to the trial court that he did not understand the proceedings due in part to a lack of communication by his lawyers. Kidd also complained that he was not read his *Miranda* rights when he received his

12

indictment, he was being held for ransom, and he did not wish to accept a plea. The court noted Kidd's confusion and ordered a competency evaluation, and the case was continued.

{¶48} At the next hearing, the trial court informed Kidd that it had received a Court Clinic report stating that Kidd refused to participate in the evaluation. Kidd's counsel explained that Kidd refused to participate until he had new attorneys. Kidd confirmed that he wanted new counsel for the same communication issues he had previously expressed. Kidd further explained that he understood the proceedings, but his attorneys had not provided him with discovery or discussed the trial with him. His attorneys confirmed that the relationship had broken down due primarily to Kidd's family, and counsel asked to be removed from the case. Kidd told the trial court that he had previously been found competent, and he did not wish to speak with the doctor. The case was continued for the trial court to appoint new counsel.

{¶49} Eleven months later, Kidd's new counsel withdrew the suggestion of incompetency and explained that based on his contact with Kidd, he had no concerns with Kidd's competency and expressed his belief that Kidd was competent. Counsel filed an entry withdrawing the suggestion of incompetency, and the case proceeded to trial.

{¶50} Under Ohio law, "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial. The conviction of an accused while he is not legally competent to stand trial violates due process of law." (Internal citations omitted.) *State v.*

13

*Rubenstein*, 40 Ohio App.3d 57, 60, 531 N.E.2d 732 (8th Dist.1987).

**{¶51}** R.C. 2945.37 provides that if the defendant raises the issue of competency before trial, the trial court must conduct a hearing to determine, upon the evidence submitted, whether the defendant is competent. "The competency issue is one that can be waived by the parties. A hearing is not required in all situations, only those where the competency issue is raised and maintained." *State v. Smith*, 8th Dist. Cuyahoga No. 95505, 2011-Ohio-2400, ¶ 5.

**{¶52}** Here, Kidd withdrew the suggestion of incompetence filed by his previous attorneys. Kidd's current trial counsel, who had been representing Kidd for almost a year, assured the court that Kidd was competent based on his interactions and communications with Kidd. Moreover, the record does not indicate that Kidd exhibited any signs of incompetency. Although Kidd was initially confused about the court process, the record indicates that his confusion was based primarily on the miscommunication between Kidd and his former lawyers.

**{¶53}** Based on this record, we conclude that the trial court did not err by accepting Kidd's waiver of the competency issue. *See id.* This assignment of error is not well taken and is overruled.

### Proof of Venue

**{¶54}** For ease of discussion, we next address the sixth assignment of error. Kidd challenges his conviction on count four, engaging in fellatio with A.O., asserting that the state failed to prove the offense occurred in Hamilton County.

**{¶55}** "[V]enue must be proved beyond a reasonable doubt in a criminal case." *State v. Gardner*, 42 Ohio App.3d 157, 536 N.E.2d 1187 (1st Dist.1987). Kidd

14

did not raise the issue of venue in the trial court, but the failure to prove venue is plain error. *Id.* at 158. Venue can be established "by the evidence as a whole or by circumstantial evidence." *State v. Tapke*, 1st Dist. Hamilton No. C-060494, 2007-Ohio-5124, ¶ 59. To prove venue, the state must submit sufficient evidence to justify a reasonable inference that the violation occurred in the county alleged in the indictment. *Id.*

**{¶56}** Here, the state was required to prove that the offense occurred in Hamilton County. Count four charged Kidd with engaging in fellatio with A.O. A.O. testified that Kidd put his penis in A.O.'s mouth while Kidd was driving. A.O. testified that his mother was home at the time of this offense, but during the Mayerson Center interview, he stated the offense occurred after his mother called and asked to be picked up from her job at a Chinese restaurant. However, McBride determined that A.O.'s mother had not been employed for years, so no Chinese restaurant was ever identified.

**{¶57}** A.O. could not identify any street names, cities, or counties to establish where the offense occurred. A.O. did not provide any details that would allow the factfinder to conclude that the offense occurred in Hamilton County. Therefore, the evidence was insufficient to support the conviction. *See Gardner* at 157-158.

**{¶58}** We sustain the sixth assignment of error.

### Sufficiency of the Evidence

**{¶59}** Next, Kidd argues that the judgment was not supported by sufficient evidence with respect to counts five and six. Counts two and five alleged that Kidd

15

engaged in fellatio with A.O. by placing A.O.'s penis in his mouth. Counts three and six alleged that Kidd placed his penis in A.O.'s anal opening.

**{¶60}** "In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found all the essential elements of the crime proved beyond a reasonable doubt." *State v. Ham*, 1st Dist. Hamilton No. C-170043, 2017-Ohio-9189, ¶ 19, citing *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶61}** A.O. described a specific incident where Kidd put his mouth on A.O.'s penis and testified it happened "more than one time." A.O. also testified that Kidd put his penis in A.O.'s "butt" and did so "more than" one time. Kidd contends that the testimony that each incident occurred more than once is insufficient to support those convictions.

**{¶62}** A.O.'s testimony that it happened more than once is sufficient to support the guilty findings. *See State v. Dean*, 5th Dist. Holmes No. 07CA013, 2008-Ohio-2146, ¶ 21 (concluding that the victim's testimony that it happened more than once was "sufficient to support the findings of guilt as to the rape charges."); *State v. Mosely*, 10th Dist. Franklin No. 05AP-701, 2006-Ohio-3102, ¶ 23 (determining that the victim's testimony that vaginal penetration occurred three or four times "sufficiently satisfies each element of the crime charged for the specified number of occurrences."); *State v. Langston*, 8th Dist. Cuyahoga No. 71578, 1998 WL 57152, *4 (February 12, 1998) (explaining that the child's testimony that it happened "more than once" was sufficient to support two counts of rape).

{¶**63**} Because A.O.'s testimony was sufficient to support the guilty findings on both counts, we overrule the fifth assignment of error.

## Manifest Weight of the Evidence

{¶**64**} In the seventh assignment of error, Kidd contends that the judgment was against the weight of the evidence because A.O.'s IQ was only 58. In essence, Kidd argues that the jury should have disregarded A.O.'s testimony on the basis of his low IQ.

{¶**65**} When considering a challenge to the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983), paragraph three of the syllabus.

{¶**66**} Generally, credibility is an issue for the trier of fact to resolve. *See State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001). "Because the trier of fact sees and hears the witnesses and is particularly competent to decide 'whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d 1047,¶ 20, citing *State v. Konya*, 2d Dist. Montgomery No. 21434, 2006-Ohio-6312, ¶ 6, quoting *State v. Lawson*, 2d Dist.

17

Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶67} As previously discussed, A.O. was competent to testify, and the jury was in the best position to determine A.O.'s credibility and rationally could have believed his testimony. Based on this record, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice. We overrule the seventh assignment of error.

### Sentences of Life Imprisonment

{¶68} Next Kidd challenges his sentences of life without parole as disproportionate to the offenses committed, constituting cruel and unusual punishment.

{¶69} Generally, if a sentence falls within the terms of a valid statute, it cannot amount to cruel and unusual punishment. *See McDougle v. Maxwell*, 1 Ohio St.2d 68, 69, 203 N.E.2d 334 (1964). "Outside the death penalty context, the Eighth Amendment does not require strict proportionality between crime and sentence but forbids only extreme sentences that are grossly disproportionate to the crime." *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991).

{¶70} Although Kidd did not challenge the constitutionality of his sentence in the trial court, he now contends that life without parole is so disproportionate to the crime of rape of a child under ten, as to constitute cruel and unusual punishment.

{¶71} This argument has been repeatedly rejected by Ohio appellate courts. In *State v. Driscoll*, 2d Dist. Clark No. 2008 CA 93, 2009-Ohio-6134, ¶ 29, the court held that "[defendant's] sentence of life without parole for raping [a] four year old * * * in violation of R.C. 2907.02(A)(1)(b), does not constitute cruel and unusual

18

punishment, because it is not disproportionate or shocking to the moral sense of the community, in view of the heinous nature of the crime." (Internal quotations omitted.) The Eleventh District Court of Appeals similarly concluded that "considering the heinousness of the crime of raping a nine-year-old child, it cannot be said that appellant's [life] sentence was disproportionate or shocking to the moral sense of the community." *State v. Gladding*, 66 Ohio App.3d 502, 513, 585 N.E.2d 838 (11th Dist.1990). In *State v. Glaze*, 6th Dist. Lucas No. L-17-1269, 2019-Ohio-53, ¶ 26, the court concluded that a sentence of life without parole for the rape of a child under the age of ten was not disproportionate to the conduct involved.

{¶72} We agree with our sister courts that a sentence of life without parole for the rape of a child under the age of ten is not so disproportionate to shock the moral sense of the community, and overrule Kidd's eighth assignment of error.

Consecutive Sentences

{¶73} In his ninth assignment of error, Kidd contends that the aggregate sentence is contrary to law because the trial court did not make the requisite findings to impose consecutive sentences.

{¶74} When reviewing felony sentences, a reviewing court may overturn the imposition of consecutive sentences where the court "clearly and convincingly" finds that (1) "the record does not support the sentencing court's findings under R.C. 2929.14(C)(4)," or (2) "the sentence is otherwise contrary to law." The imposition of consecutive sentences is contrary to law if a trial court fails to make the findings mandated by R.C. 2929.14(C)(4). *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37.

{¶75} The trial court must make the statutory findings at the sentencing hearing, which means that " 'the [trial] court must note that it engaged in the analysis' and that it 'has considered the statutory criteria and specifie[d] which of the given bases warrants its decision.' " *Bonnell* at ¶ 26, quoting *State v. Edmonson*, 86 Ohio St.3d 324, 326, 715 N.E.2d 131 (1999). A trial court is not, however, required to state its reasons to support its findings, nor is it required to precisely recite the statutory language, "provided that the necessary findings can be found in the record and are incorporated in the sentencing entry." *Bonnell* at ¶ 37.

{¶76} In this case, when making the requisite finding under R.C. 2929.14(C)(4), the trial court found that consecutive sentences were necessary to protect the public and not disproportionate to the seriousness of his conduct, the harm caused by two or more of the offenses was so great and unusual that no single prison term would reflect the seriousness, and based upon his criminal history and the need to protect the public, consecutive sentences were warranted. And a review of the record supports the court's finding.

{¶77} However, as the state concedes, the trial court did not incorporate the findings in the sentencing entry as required by *Bonnell* at syllabus. Therefore, we sustain the ninth assignment of error, in part, and overrule it in part, and remand the cause to the trial court for a nunc pro tunc entry to incorporate the findings in the entry of conviction.

### No-contact Order

{¶78} In his final assignment of error, Kidd contends that the trial court erred by imposing a no-contact order along with the sentence of life in prison

20

without parole. The state concedes the error and joins Kidd in asking this court to vacate the no-contact order.

**{¶79}** Accordingly, we sustain the tenth assignment of error and remand the cause to the trial court with instruction to vacate the no-contact order.

### Conclusion

**{¶80}** We sustain Kidd's sixth and tenth assignments of error, and we sustain the ninth assignment of error, in part. We reverse the conviction on count four and remand the cause to the trial court with instructions to vacate the conviction on count four, enter a nunc pro tunc order correcting the omission of the consecutive-sentences findings from the sentencing entry, and to vacate the no-contact order in the sentencing entry. We affirm the trial court's judgment in all other respects.

Judgment affirmed in part, reversed in part, and cause remanded.

**BERGERON** and **WINKLER, JJ.,** concur.

Please note:
The court has recorded its own entry this date.